**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MID-ATLANTIC INNOCENCE PROJECT,

      Plaintiff,

   v.

DEPARTMENT OF JUSTICE,

      Defendant.

Civil Action No. 23-cv-1111 (AHA)

<u>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ iv

**INTRODUCTION** ................................................................................................................. 1

**FACTUAL BACKGROUND** ................................................................................................ 2

   **A.**    **Plaintiff's May 2022 FOIA Request For Records Related To The Prosecution Of Mr. Davis For Mr. Smith's Murder** ................................................................................ 4

   **B.**    **Plaintiff's February 2024 FOIA Request for All Records Related to the Investigation and Prosecution of Smith's Murder** ...................................................... 5

**LEGAL STANDARD** ........................................................................................................... 7

**ARGUMENT** ........................................................................................................................ 9

   **I.**    **Defendant Failed To Process All Responsive Records In Violation Of The FOIA** .... 10

   **II.**    **The Defendant's Categorical Denial Of "Third Party" Records Violated The FOIA.** 18

   **III.**    **The Defendant Has Failed To Demonstrate That The Privacy Interests Of Publicly Identified, Deceased Or Convicted Persons In A Thirty-Year-Old Murder Case Support Either Categorical Exemption Or Withholding Under Exemption 6 and 7(c)** .............. 22

     A.   Defendant Has Failed To Account for the De Minimis Privacy Interests of Those Who Are Deceased, Convicted Individuals, or Publicly Known. .................................................. 22

     B.   The Public Interest In Disclosure Outweighs The Privacy Interests Asserted By The Defendant.................................................................................................................................. 28

   **IV.**    **Defendant Has Failed To Justify Its Assertion Of Exemption 5** ............................. 31

A.    Attorney Work Product and Deliberative Process Materials Under Exemption 5......... 31

**V.    The Defendant Did Not Meet Its Burden Under FOIA's Segregability**

**Requirement.** ................................................................................................................. **35**

**VI.    Defendant Has Failed to Satisfy the Foreseeable Harm Requirement**.................... **38**

A.    Exemption 5 ........................................................................................................... 39

B.    Exemptions 6 and 7(C) .......................................................................................... 40

**CONCLUSION** ................................................................................................................... **41**

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*ACLU v. U.S. Dep't of Justice*,

   655 F.3d 1 (D.C. Cir. 2011).................................................................. 7, 24, 26

*Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*,

   830 F.3d 667 (D.C. Cir. 2016)........................................................................ 19

*Am. Oversight v. U.S. Dep't of Health and Hum. Servs.*,

   101 F.4th 909 (D.C. Cir. 2024)...................................................................... 16

*Amadis v. United States Dep't of State*,

   971 F.3d 364 (D.C. Cir. 2020)....................................................................... 15

*Ancient Coin Collectors Guild v. U.S. Dep't of State*,

   641 F.3d 504 (D.C. Cir. 2011)....................................................................... 11

*Armstrong v. Exec. Off. of the President*,

   97 F.3d 575 (D.C. Cir. 1996)......................................................................... 28

*Bartko v. United States Dep't of Just.*,

   62 F. Supp. 3d 134 (D.D.C. 2014)................................................................. 29

*Beck v. Dep't of Justice*,

   997 F.2d 1489 (D.C. Cir. 1993)..................................................................... 29

*Black v. U.S. Dep't of Just.*,

   69 F. Supp. 3d 26 (D.D.C. 2014)................................................................... 23

*Blackwell v. FBI*,

   646 F.3d 37 (D.C. 2011)............................................................................... 17

*Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. United States DOJ*, Civ. No. 18-1860,

   2021 U.S. Dist. LEXIS 122947, at *2 (D.D.C. July 1, 2021) ................................. 24

iv

*Burke v. U.S. Department of Justice*, Civ. No. 96-1739, ,

   1999 U.S. Dist. LEXIS 17542 (D.D.C. Sept. 30, 1999) ........................................................ 22

*Callaway v. United States Dep't of Treasury*, Civ. No. 04-1506,

   2007 U.S. Dist. LEXIS 102512, at *30 (D.D.C. Aug. 31, 2007) .......................................... 26

*Carter v. U.S. Dep't of Com.*,

   830 F.2d 388 (D.C. Cir. 1987) ............................................................................................ 35

*Citizens for Resp. & Ethics in Wash. v. U.S. DOJ*,

   58 F.4th 1255 (D.C. Cir. 2023) ........................................................................................... 25

*Citizens for Resp. & Ethics in Wash. v. United States DOJ*,

   746 F.3d 1082 (D.C. Cir. 2014) .......................................................................................... 21

*Cleveland v. United States*,

   128 F. Supp. 3d 284 (D.D.C. 2015) ................................................................................... 33

*Coastal States Gas Corp. v. Dep't of Energy*,

   617 F.2d 854 (D.C. Cir. 1980) ..................................................................................... 33, 34

*Comm. for Freedom of the Press v. FBI*,

   3 F.4th 350 (D.C. Cir. 2021) .................................................................................... 9, 39, 40

*Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*,

   567 F. Supp. 3d 97 ................................................................................................................ 8

*Cottone v. Reno*,

   193 F.3d 550 (D.C. Cir. 1999) ..................................................................................... 25, 26

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,

   436 F. Supp. 3d 90 (D.D.C. 2019) ..................................................................................... 34

*Ctr. for Investigative Reporting v. United States Dep't of the Interior*,

    613 F. Supp. 3d 327 (D.D.C. 2020)............................................................................... 39, 41

*Davis v. U.S. Dep't of Just.*,

    460 F.3d 92 (D.C. Cir. 2006)............................................................................................. 23

*Davis v. U.S. Dep't of Just.*,

    968 F.2d 1276 (D.C. Cir. 1992)......................................................................................... 25

*Hall v. Cent. Intel. Agency*,

    268 F. Supp. 3d 148 (D.D.C. 2017).................................................................................. 33

*Heffernan v. Azar*,

    317 F. Supp. 3d 94 (D.D.C. 2018).................................................................................... 37

*Hum. Rights Def. Ctr. v. United States Park Police*,

    126 F.4th 708 (D.C. Cir. 2025)............................................................................ 19, 22, 27

*In re Nat'l Broad. Co.*,

    653 F.2d 609 (D.C. Cir. 1981)........................................................................................... 26

*Jud. Watch, Inc. v. DOJ*,

    20 F.4th 49 (D.C. Cir. 2021)....................................................................................... 33, 37

*Jud. Watch, Inc. v. U.S. HHS*,

    525 F. Supp. 3d 90 (D.D.C. 2021).................................................................................... 25

*Judicial Watch, Inc. v. FDA*,

    449 F.3d 141 (D.C. Cir. 2006)...................................................................................... 8, 33

*Judicial Watch, Inc. v. U.S. Secret Serv.*,

    726 F.3d 208 (D.C. Cir. 2013)............................................................................................. 7

*Khatchadourian v. Def. Intel. Agency*,

    453 F. Supp. 3d 54 ........................................................................................... 38

*Kleinert v. Bureau of Land Mgmt.*,

    132 F. Supp. 3d 79 (D.D.C. 2015) .................................................................... 26

*Kowal v. United States Dep't of Just.*,

    107 F.4th 1018 (D.C. Cir. 2024) ....................................................................... 25

*Lardner v. FBI*,

    852 F. Supp. 2d 127 (D.D.C. 2012) ............................................................ 34, 35

*Larson v. Dep't of State*,

    565 F.3d 857 (D.C. Cir. 2009) ............................................................................ 8

*Leopold v. United States DOJ*,

    94 F.4th 33 (D.C. Cir. 2024) ............................................................................. 36

*Lewis v. United States Dep't of the Treasury*,

    851 F. App'x 214 (D.C. Cir. 2021) ................................................................... 36

*Lenz v. CIA*, Civ. No. 20-3327,

    2024 U.S. Dist. LEXIS 176679, *29 (D.D.C. Sept. 30, 2024) .......................... 25

*Maydak v. U.S. Dep't of Just.*,

    218 F.3d 760 (D.C. Cir. 2000) .......................................................................... 32

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,

    566 F.2d 242 (D.C. Cir. 1977) ...................................................................... 8, 36

*Milner v. Dep't of the Navy*,

    562 U.S. 562 (2011) ........................................................................................... 7

*Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*,

    71 F.3d 885 (D.C. Cir. 1995) ............................................................................ 15, 20

*Nat'l Archives & Records Admin. v. Favish*,

    541 U.S. 157 (2004) .............................................................................................. 29

*Nat'l Sec. Counselors v. CIA*,

    931 F. Supp. 2d 77 (D.D.C. 2013) ....................................................................... 15

*NBC 7 San Diego v. United States Dep't of Homeland Sec.*, Civ. No. 19-1146,

    2022 U.S. Dist. LEXIS 228888, *16 .................................................................... 11

*Ocasio v. U.S. Dep't of Just.*,

    219 F. Supp. 3d 191 ............................................................................................... 8

*Oglesby v. U.S. Dep't of Army*,

    920 F.2d 57 (D.C. Cir. 1990) ................................................................................. 8

*Pike vs. U.S. DOJ*,

    306 F. Supp. 3d 400 (D.D.C. 2016) ..................................................................... 26

*Pinson v. US DOJ*,

    79 F.Supp.3d 250 (D.D.C. 2015) ......................................................................... 12

*Prison Legal News v. Samuels*,

    787 F.3d 1142 (D.C. Cir. 2015) ..................................................................... 19, 28

*Raw Story v. United States U.S. Dep't of Def.*, Civ. No. 23-2514,

    2024 U.S. Dist. LEXIS 176680 ............................................................... 19, 21, 25

*Roth v. U.S. Dep't of Just.*,

    642 F.3d 1161 (D.C. Cir. 2011) ................................................................ 17, 29, 31

*SafeCard Services, Inc. v. SEC*,

    926 F.2d 1197 (D.C. Cir. 1991) ................................................................ 16, 20

*Schrecker v. U.S. Dep't of Just.*,

    349 F. 3d 657 (D.C. Cir. 2003) ................................................................ 23, 28

*Shapiro v. United States DOJ*,

    944 F.3d 940 (D.C. 2019) ............................................................................... 13

*U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*,

    510 U.S. 487 (1994) ....................................................................................... 29

*U.S. Dep't of Justice v. Reps. Comm. for Freedom of the Press*,

    489 U.S. 749 (1989) ......................................................................... 7, 18, 19

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,

    592 U.S. 261 (2021) ....................................................................................... 32

*United States DOJ v. Landano*,

    508 U.S. 165 (U.S. 1993) .............................................................................. 18

*Valencia-Lucena v. United States Coast Guard*,

    180 F.3d 321 (D.C. Cir. 1999) ..................................................................... 16

*White Coat Waste Project v. United States Dep't of Veterans*,

    404 F. Supp. 3d 87 (D.D.C. 2019) ............................................................... 28

*Wilderness Soc'y v. Dep't of Interior*,

    344 F.Supp.2d 1 (D.D.C. 2004) ............................................................. 37, 41

*Wildlife v. U.S. Border Patrol*,

    623 F. Supp. 2d 83 (D.D.C. 2009) ......................................................... 16, 37

*Wolf v. CIA*,

    473 F.3d 370 (D.C. Cir. 2007) ........................................................................... 26

*Wright v. U.S. Dep't of Justice*, Civ. No. 14-558,

    2015 U.S. Dist. LEXIS 31533 (D.D.C. Mar. 16, 2015) ........................................ 20

Statutes

5 U.S.C. § 552(a)(6)(A)(ii) ..................................................................................... 7

5 U.S.C. § 552(a)(8)(A) ......................................................................................... 41

5 U.S.C. § 552(a)(8)(A)(i) ...................................................................................... 9

5 U.S.C. § 552(a)(8)(A)(i)(I) .................................................................................. 39

5 U.S.C. § 552(a)(8)(A)(ii) ..................................................................................... 36

5 U.S.C. § 552(b) ............................................................................................. 8, 36

5 U.S.C. § 552(b)(5) .............................................................................................. 32

Rules

Federal Rule of Civil Procedure 56(a) ............................................................... 1, 7

Plaintiff Mid-Atlantic Innocence Project ("MAIP") opposes the motion for summary judgment filed by Defendant, the U.S. Department of Justice ("DOJ"). MAIP cross-moves under Federal Rule of Civil Procedure 56(a) for summary judgment against the Defendant for violating the Freedom of Information Act ("FOIA").

## INTRODUCTION

This case arises from two FOIA requests submitted by MAIP to the Executive Office of the United States Attorneys ("EOUSA" or "Defendant"), seeking records on behalf of Anthony Davis related to the 1993 murder of Adrian Smith. MAIP represents Mr. Davis, who was convicted of Smith's murder in 1996, and who has consistently maintained his innocence. Declaration of Margaret Abernethy, ¶ 4 (hereinafter "Abernethy Decl."). MAIP's requests for investigative and prosecutorial records seek to uncover evidence relevant to whether Mr. Davis was wrongly convicted and, if so, whether the government contributed to it.

In response to MAIP's 2022 FOIA request for records related to the investigation and prosecution of Anthony Davis for Smith's murder, the Defendant located 26 boxes of potentially responsive records. The Defendant has not clearly described the contents of those boxes. What is clear is that Mr. Davis was tried twice and engaged in extensive post-conviction litigation, which would ordinarily generate a large volume of material. Yet, the Defendant processed just a small portion of these boxed materials, about 2,300 pages, which it claimed related to Mr. Davis. It redacted or withheld nearly two-thirds of those pages.

Many of those withholdings and redactions were made on privacy grounds. In weighing those asserted privacy interests, the Defendant entirely failed to consider whether the subjects of those records are deceased, that many were convicted of crimes connected to the Smith homicide, and that many testified in open court thirty years ago. The Defendant thus overstates

1

the *de minimis* privacy interests of those persons, while ignoring the powerful countervailing public interest in ensuring that the criminal justice system does not convict the innocent.

In 2024, MAIP filed a second and broader FOIA request for records related to the investigation and prosecution of the Smith homicide. That request's scope goes beyond those records related solely to Mr. Davis. Those records would surely include, for example, police reports, notes of witness interviews, forensic testing—the stuff of a standard police investigation that precedes the identification of particular suspects. Yet, the Defendant processed and produced nothing further from the 26 boxes of records it found. Instead, the Defendant wrongly asserted that MAIP's 2024 request sought an unspecified volume of "third-party material."

The Defendant did not review that material, but withheld all of it categorically on privacy grounds. The Defendant's categorical withholding rests on a misreading of MAIP's FOIA request, which did not request records singularly connected to third parties, and defies clear law on categorical withholdings. Defendant additionally failed to establish a basis for its Exemption 5 withholdings, failed to demonstrate that it segregated non-exempt material, and failed to show that disclosure of withheld material would cause foreseeable harm. Accordingly, the Defendant's motion for summary judgment should be denied and Plaintiff's cross-motion granted.

## FACTUAL BACKGROUND

FOIA requests can exonerate innocent people. In 2019, three innocent men from Baltimore were freed after serving 36 years in prison for a murder they did not commit. *See Baltimore to Pay $48 Million to 3 Men Wrongly Convicted of Murder as Teen*s, N.Y. TIMES, https://www.nytimes.com/2023/10/19/us/baltimore-settlement-wrongly-imprisoned-men.html. They would have remained in prison had one of them not submitted a FOIA request for the police file in their case. That file revealed that several witnesses had identified someone else as

the gunman. *Id.* With the assistance of MAIP, they used these records to overturn their convictions. *Id.* Unfortunately, these men are not alone. According to the National Registry of Exonerations, over 3,660 individuals in the United States have been exonerated since 1989.[1] Anthony Davis may also merit entry into the National Registry.

Adrian Smith was killed on August 4, 1993, at 4957 G St., SE in Washington D.C. *See* Abernethy Decl. Exh. 1 at 2. The D.C. Metropolitan Police Department ("MPD") initially believed that Joseph Wright paid Melvin Beach, Eugene Mills, and Anthony Davis to kill Mr. Smith as a result of a drug territory dispute. *See id.* at 2-5; *see also* Abernethy Decl. Exh. 2 at 14. On April 23, 1994, a grand jury publicly indicted Beach, Mills, Wright, and Davis based upon this theory. *See* Exh. 1 at 3. Prior to trial, however, the prosecution changed its theory of the case. The motive for the shooting shifted from a territorial dispute to a retaliatory shooting arising from an earlier incident in which Smith shot at a man named Mark Ray. *See* Exh. 2 at 15-16. The alleged perpetrators of the retaliatory shooting also shifted from Beach, Mills, and Davis, to Davis, Dawain Arrington, and Lee Johnson. *See* Exh. 1 at 4-5.

Anthony Davis was the only defendant to proceed to trial. Exh. 1 at 4; Exh. 2 at 19. By that time, several co-defendants had entered into plea agreements with the government, *see* Exh. 2 at 16-18, and Mills had been killed in the D.C. Jail. Abernethy Decl. Exh. 3. At Mr. Davis's first trial in D.C. Superior Court, 16 witnesses testified.[2]  On July 7, 1995, a mistrial was declared after the jury deadlocked. *See* Abernethy Decl. Exh. 2 at 20.

_____

[1] NATIONAL REGISTRY OF EXONERATIONS, https://exonerationregistry.org/ (last visited April 22, 2025).

[2] Witnesses at Mr. Davis's 1995 trial included: Officer Lamont Allen, Dr. Marie-Lydie Pierre-Louis; Officer Jerome Lucas, Officer Stephen Ritchie, Officer William Jacob, Elizabeth Gillis; Linwood Watkins, Jerry Jenkins; Angelo Parisi, Mark Ray; Dawain Arrington, Melvin Beach; Raymond Payne, Tameka Jones, Detective Pierre Mitchell; and Detective Ray Anthony Crawford. Abernethy Decl. Exh, 4.

In October 1995, the case was re-indicted, charging Mr. Davis and Lee Johnson for murder. Mr. Davis proceeded to trial a second time on February 5, 1996. *Id.* This time, the government called 19 witnesses, including Johnson, in its case against Mr. Davis.[3] Mr. Davis called one witness, Richard Bracey, in his defense, who testified that he was told by Melvin Beach to put the crime on Anthony Davis. *See id*. at 20-21. On February 12, 1996, the jury found Mr. Davis guilty of Adrian Smith's murder. *See id.* at 21.

Mr. Davis was released on parole in December 2022 after serving nearly three decades in prison. *See* Abernethy Decl. ¶ 5. His sentence was later reduced in early 2023 under D.C.'s Incarceration Reduction Amendment Act. *Id.*

### A. Plaintiff's May 2022 FOIA Request For Records Related To The Prosecution Of Mr. Davis For Mr. Smith's Murder

On May 13, 2022, MAIP submitted a FOIA request to Defendant for "all records pertaining to Anthony Lamont Davis, from the Defendant, in relation to D.C. Superior Court criminal action number F-3159-94." Declaration of Auborn Finney ("Finney Decl."), ¶ 6;[4] Abernethy Decl. Exh. 6. Defendant acknowledged this request as FOIA No. 2022-001982. Finney Decl., ¶ 7. When Defendant failed to timely produce any records, MAIP filed this lawsuit

---

[3] Witnesses at Mr. Davis's 1996 trial included: Jerome E. Lucas, Lamont J. Allen, Joe L. Henderson, Stephen Ritchie, Dr. Marie-Lydie Pierre-Louis, William Frederick Jacob, III, Elizabeth Ann Gillis, Linwood Levi Watkins, Angelo Parisi, Jerry A. Jenkins, Mark Anthony Ray, Dawain Antoine Arrington, Melvin Tyrone Beach, Lee Johnson, Raymond Payne, Tara Patricia Powell, Tameka Jones, Ray Anthony Crawford, Pierre E. Mitchell, and Richard Bracey. Abernethy Decl. Exh. 5.

[4] The Finney Declaration states that it attached eight exhibits, Exhibits 1-8, which appear to reflect the procedural background of the FOIA requests and responses. No exhibits were attached. Thus, some of those documents are attached to Ms. Abernethy's Declaration.

on April 21, 2023. ECF No. 1. While this lawsuit was pending, Defendant located approximately

26 boxes of records in its archives. *See* Declaration of Gary Nails ("Nails Decl."), ¶¶ 10, 13.

According to Defendant's declarant, USAO-DC FOIA officer Gary Nails, the agency

initially identified 780 pages of records within the 26 boxes that related to Mr. Davis and

transmitted them for processing. Nails Decl., ¶ 18. Defendant produced these records, in part, on

a rolling basis. Finney Decl., ¶ 10. After receiving the 2024 FOIA request, described below, the

Defendant conducted a second review of records within the 26 boxes, focused exclusively on

"court-filed public records and any grand jury materials related to Anthony Davis." Nails Decl.,

¶ 22. This secondary search produced an additional 1,495 pages, consisting of 25 pages of grand

jury material and about 1,470 pages of public, court-filed records concerning Mr. Davis, about

800 pages of which were located not in the boxes, but in the electronic file of an Assistant U.S.

Attorney who handled Mr. Davis' Incarceration Reduction Amendment Act matter. *Id.*, ¶¶ 12,

23.

Defendant's *Vaughn* index claims to have processed 2,256 pages, releasing 832 pages in

full, 947 pages in part, and withholding 477 pages in full. *Vaughn* Index at 1. But Mr. Nails

claims to have processed 2,275 pages of records. Nails Decl., ¶ 24. The disclosures made,

however, were numbered Bates 1-2316.  Abernethy Decl., ¶ 14. The reasons for these differing

numbers are not clear. The records include investigative materials, police reports, trial exhibits,

correspondence, witness statements, and trial transcripts. *See generally Vaughn* index.

### B.  Plaintiff's February 2024 FOIA Request for All Records Related to the Investigation and Prosecution of Smith's Murder

Given the relatively small number of pages processed from the 26 boxes in response to

the 2022 FOIA request, it became clear that Defendant narrowly focused only on pages

mentioning or related to Anthony Davis. *See* Nails Decl., ¶ 18. To address Defendant's

interpretation of MAIP's 2022 request, MAIP submitted a second and broader FOIA request dated February 26, 2024. *See* Abernethy Decl., ¶ 15, Exh. 8. This request sought records pertaining to "the investigation(s), subsequent investigation(s), arrests, indictment, and prosecution of all individuals arising from the murder of [sic] Smith . . .". *Id.* In addition, it requested "[a]ll records relating to the D.C. Superior Court criminal action number F-3159-94, and any other case number associated with any prosecution of any defendant for the murder of Mr. Smith. . . . " *Id.* The request listed, as possible examples of such cases, six Superior Court Criminal Division case numbers involving individuals other than Mr. Davis who were charged with various offenses related to Smith's murder.[5] *Id.* Last, the request sought records related to "the investigation(s) and/or prosecution of Anthony Lamont Davis and any and all suspects and defendants in connection with murder of Mr. Smith . . .". *Id.*

Rather than requesting records pertaining only to Mr. Davis, as the Defendant interpreted the first request, the second FOIA request sought all records arising from the Smith homicide. In doing so, MAIP did not seek records about identified third parties or records that would necessarily contain only exempt information. Nonetheless, the Defendant split this request into two parts: EOUSA-2024-001302 (for Mr. Davis) and EOUSA-2024-001323 (for third parties). Finney Decl., ¶ 12; Abernethy Decl. Exh. 9. By letter dated March 1, 2024, Defendant closed the former as duplicative of the 2022 request. Finney Decl., ¶ 13; Abernethy Decl. Exh. 10. In a separate letter also dated March 1, 2024, the Defendant categorically denied request EOUSA-2024-001323 without conducting any additional searches on the grounds that MAIP sought records concerning third parties without providing privacy waivers. *See* Finney Decl., ¶ 14; Abernethy Decl. Exh. 11.

---

[5] Two of the six cases listed as examples in the 2024 MAIP request are among the nine case files listed in Paragraph 16 of the Nails Declaration.

On May 3, 2024, MAIP administratively appealed that denial, Abernethy Decl., ¶ 19, and the Defendant did not respond within twenty business days, as required by statute. 5 U.S.C. § 552(a)(6)(A)(ii). Having constructively exhausted its administrative remedies, MAIP moved to amend its complaint to add a claim regarding its 2024 FOIA request. ECF No. 21. The Defendant failed to respond, and Judge Moss treated the motion as conceded, granting it by Minute Order on July 21, 2024. The parties now bring cross motions for Summary Judgment related to the Defendant's processing of the two FOIA requests.

## LEGAL STANDARD

Summary judgment is the typical procedural mechanism for resolving disputes under the FOIA. Fed. R. Civ. P. 56(a); *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013). Courts decide FOIA cases *de novo*, and the government bears the burden of justifying its decision to withhold records. *U.S. Dep't of Justice v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). The FOIA is animated by a "strong presumption in favor of disclosure," and its exemptions must be "narrowly construed." *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011); *see also Milner v. Dep't of the Navy*, 562 U.S. 562, 571 (2011).

To prevail on summary judgment, an agency must demonstrate that it has fully discharged its FOIA obligations through an adequate search for responsive records with the underlying facts and inferences analyzed in the light most favorable to the FOIA requester. *See Ocasio v. U.S. Dep't of Just.,* 219 F. Supp. 3d 191, 194-95 (D.D.C. 2016). When exemptions are asserted, the agency must provide affidavits or declarations that are "reasonably detailed," nonconclusory, and submitted in "good faith." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006).

Such declarations must describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption," and show that the justifications are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). FOIA plaintiffs are not required to demonstrate an absence of genuine factual disputes to prevail at summary judgment—rather, they need only show that the government has failed to meet its statutory obligations. *See, e.g., Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, 567 F. Supp. 3d 97, 125 (D.D.C. 2021).

Even when a FOIA exemption applies, an agency can only withhold information if it also satisfies two additional requirements: segregability and foreseeable harm. Under FOIA's segregability mandate, "[a]ny reasonably segregable portion of a record shall be provided…after deletion of the portions which are exempt." 5 U.S.C. § 552(b); *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). Agencies must provide the reasons behind a claimed inability to segregate information, and "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *See Mead Data Cent., Inc.*, 566 F.2d at 260–61. As for foreseeable harm, under the 2016 FOIA Improvement Act, 5 U.S.C. § 552(a)(8)(A)(i)(I), an agency must "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld," *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369-70 (D.C. Cir. 2021) (internal quotation omitted). Boilerplate or speculative assertions of harm are insufficient. *Id.*

An agency's failure to meet its burden as to any of these requirements—adequate search, valid exemption, segregability, or foreseeable harm—requires denial of its motion for summary

judgment and may warrant judgment in favor of the requester. *See, e.g., Reps. Comm. for Freedom of the Press*, 3 F.4th at 361.

## ARGUMENT

The Defendant violated the FOIA by failing to fully search, process, and justify the withholding of a substantial number of responsive records found within the 26 boxes of recovered materials. Despite acknowledging the existence of these boxes, the Defendant provided vague and contradicting accounts regarding their contents and improperly deemed a large portion as either nonresponsive or categorically exempt without adequate review or explanation. Further, the Defendant's blanket refusal to search for or process records it labeled as "third party," without conducting a page-by-page review or identifying the nature of these records, violates FOIA's prohibition against categorical denials in these circumstances.

As for the records that were provided, many of the withholdings and redactions were made on privacy grounds.[6] In weighing those asserted privacy interests, the Defendant failed to determine whether the subjects of those records are deceased, and failed to consider that many were convicted of crimes connected to the Smith homicide. Moreover, the Defendant ignored that trial transcripts, briefs and other documents are in the public domain, revealing the names of witnesses and their connections to this thirty-year-old homicide, thus rendering *de minimis* any claimed privacy interests. To the extent a claimed privacy interest is not *de minimis*, the Defendant overstates those interests while ignoring the powerful countervailing public interest in ensuring that the criminal justice system does not convict the innocent. The Defendant, further, overlooks how these minimal privacy interests leave it unable to demonstrate that it properly

---

[6]  MAIP does not challenge the withholdings of Bates 1669-1671, the items set forth in pages 23-26 of the *Vaughn* Index regarding the Incarceration Reduction Amendment Act litigation and portions of Bates 414-575 that were court sealed.

segregated non-exempt material, and that disclosure would cause foreseeable harm. For these reasons, and additional ones to follow, the Defendant's motion for summary judgment should be denied and Plaintiff's cross-motion granted.

**I.    Defendant Failed To Process All Responsive Records In Violation Of The FOIA.**

Since early in this litigation, it has been clear that the Defendant recovered 26 boxes of records following receipt of MAIP's initial 2022 FOIA request. Joint Status Report (Jul. 26, 2023) ECF. No. 10. It remains unclear what exactly those boxes contain. That uncertainty arises from (i) the Defendant's failure to fully review and process all records within those boxes and (ii) its insufficient explanation of whatever it found within them. These twin violations of the FOIA do not permit this Court to conclude that the Defendant correctly interpreted MAIP's requests and properly processed them.

Although the contours of these categories are not clear, a fair reading of the Defendant's declarations indicates that it determined that a group of records was nonresponsive to Plaintiff's FOIA requests, and that another group of records *were* responsive, but categorically exempt on privacy grounds. The result of those determinations, which violated the FOIA for different reasons, is that the Defendant did not review and process most of the records it found. MAIP addresses each group in turn.

The Defendant claims that many (described varyingly as both a "majority" and 90%) of the records within the located 26 boxes "did not pertain to Mr. Davis," but "rather to a separate homicide investigation and prosecution involving the so-called Eastgate Crew." Nails Decl., ¶ 17. Presumably, it regards these records as unresponsive, but the Defendant does not describe the

nature of this "separate" investigation, what alleged crime or crimes caused it, or who it targeted.[7]

An agency must not only "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents," *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (internal citation omitted), but also that it accurately distinguished between responsive and unresponsive records prior to processing the former for possible exemption or disclosure. *NBC 7 San Diego v. United States Dep't of Homeland Sec.*, Civ. No. 19-1146, 2022 U.S. Dist. LEXIS 228888, *16-*51 (D.D.C. Dec. 20, 2022) (court repeatedly rejects agency's non-responsiveness determinations supported by conclusory and insufficiently detailed affidavits). Here, the Defendant failed to provide this Court the guidance it needs to decide whether it satisfied its burden of showing that a majority (or 90%) of the records were non-responsive. *See Human Rights Def. Ctr. v. U.S. Park Police,* 126 F.4th 708, 712-13 (D.C. Cir. 2025) (government has the burden of showing that documents requested should be withheld).

The Defendant, further, runs headlong into another recurring mistake: its erroneous view that MAIP sought records only about Mr. Davis. *See NBC 7 San Diego*, *supra,* at *49 (concluding that the defendants have "inappropriately deemed records non-responsive based on unreasonable interpretations of the specific requests in this case"). As explained, in its 2024 request, MAIP sought a far broader scope of records—all those arising from the Smith homicide, whether or not they mentioned Mr. Davis. These records would encompass material relating to

---

[7]  At the same time, the Defendant provided MAIP records related to the homicide of a Carlton Barnes and the 1996 strangulation of a Jane Doe. Abernethy Decl. Exh. 7. The Defendant did not explain why it disclosed those records which did not pertain to Mr. Davis and involved different homicide investigations. This makes even more confusing what the Defendant regards as the non-responsive majority of the 26 boxes.

alleged members of the Eastgate Crew. The Defendant does not explain whether the records pertaining to this "separate" homicide investigation involve others suspected of involvement in the Smith homicide—which would be responsive to the 2024 FOIA request—or are records of an investigation into the death of someone other than Mr. Smith and entirely unrelated to Mr. Davis, which would not be responsive.[8]

There is reason to think that the Defendant means the former and thus misreads MAIP's 2024 request, resulting in it overstating the scope of unresponsive records. First, as is the case in many gang-related matters, the causes and ramifications of a homicide are often blurry and involve many people. That certainly was the case here, where as described earlier, the prosecution's theory of the case changed over time and implicated different alleged participants in a series of events. As even the government conceded, "[a]s members of appellant's gang began cooperating with the government, however, the prosecution theory began to shift." Abernethy Decl. Exh. 2 at 16. The Defendant's undefined distinction between related and unrelated investigations merits no deference without a substantially more detailed description of the records found and why the Defendant regarded certain records as responsive and others not.

Here, for example, there were least two other murders linked to the Eastgate Crew that were also related to the prosecution of Anthony Davis and, thus, should be responsive to both the 2022 and 2024 requests: (1) Richard Bracey testified at Mr. Davis's trial that he initially lied to the police about Mr. Davis's involvement in Smith's murder in order to help himself get a plea

---

[8] In fact, the Defendant's declarants seem to contradict themselves. The Nails Declaration at ¶ 17 suggests that many apparently non-responsive records dealt with a homicide case involving the Eastgate Crew. The Finney Declaration at ¶ 33, in contrast, says, in connection with privacy withholdings of seemingly responsive records, that "this case" involved a group of friends called the Eastgate Crew. *See Pinson v. US DOJ*, 79 F.Supp.3d 250, 257 (D.D.C. 2015) (summary judgment is inappropriate when agency's declarants contradict each other).

deal after he was convicted of murdering Carlton Barnes. Abernethy Decl. Exh. 12;[9] (2) Melvin Beach testified at Mr. Davis's trial that he entered a guilty plea with the government that included, among other things, the murder of Marvin Clark in exchange for his testimony against Mr. Davis. Abernethy Decl. Exh. 13. If records relating to these investigations lie within the 26 boxes, they would be responsive to MAIP's requests.[10] Yet, the Defendant makes no claim that it reviewed these files, or others like them, to determine if they were responsive. *See Shapiro v. United States DOJ*, 944 F.3d 940, 943 (D.C. 2019) (finding agency affidavit insufficiently clear when it left the court with "no idea" whether certain identified records were responsive to the request) (citations omitted).

Second, after the Defendant processed MAIP's 2022 request for records pertaining to Mr. Davis, it processed *no* additional responsive records after it received MAIP's broader 2024 request for records arising from the Smith murder. Mr. Nails' first 2023 search of the 26 boxes surfaced 780 pages "related to Anthony Davis." Nails Decl., ¶ 18 ("These were the only records that pertained to Mr. Davis . . ."). His second 2024 search (made after the second MAIP request) focused "exclusively on court-filed public records and any grand jury materials related to Anthony Davis." Nails Decl. ¶ 22.[11] Thus, Mr. Nails appears not to have broadened his search after receiving MAIP's 2024 FOIA request. Not only did he look solely for records related to Mr.

---

[9]  The Defendant provided MAIP a small number of pages of records mentioning Mr. Barnes' homicide.  See Abernethy Decl. Exh. 7.

[10]   Item 3 of MAIP's 2024 request sought records pertaining to the "investigation(s) and/or prosecution of Anthony Lamont Davis, and any and all suspects and defendants in connection with [the] murder of Mr. Smith, including, but not limited to, records relevant to or memorializing: any person investigated as a potential suspect, any use of confidential informants, or any other witness information related to this case."  Abernethy Decl. Exh. 8.

[11]   Much of those materials were not found in the boxes, but in an electronic search of records of the AUSA handling the 2023 IRAA matter involving Mr. Davis.  Nails Decl. ¶¶ 12, 23.

Davis, rather than records related to the Smith murder, but he was instructed to look only for "grand jury documents and court-filed public documents . . . related to Anthony Davis." Nails Decl., ¶¶ 21- 22. Plainly, the Defendant has entirely failed to "show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested**."** *Oglesby*, 920 F.2d at 68.

  Third, the Defendant lists nine case file numbers that were located within the 26 boxes:

> 16. Within the 26 boxes were the case files of several other defendants and their cases listed below:
>
> - Beach, Melvin T., Case No. 1994FEL007395
> - Beach, Melvin T., Case No. 1993FEL011588
> - Beach, Melvin T., Case No. 1995FEL001310
> - Bracey, Richard, Case No. 1994FEL007396
> - Bracey, Richard, Case No. 1995FEL001311
> - Mills, Eugene, Case No. 1993FEL013233
> - Crews, William, Case No. 1993FEL013313
> - Beach, Melvin T., Case No. 1994FEL00806
> - Johnson, Lee, Case No. 1999FEL008693

Nails Decl., ¶ 16. It is unclear if the Defendant categorized these case files as being "unrelated" to Adrian Smith's murder and thus unresponsive to MAIP's 2024 request. If it did, it would be wrong. Many of these case file numbers pertain to charges brought as a direct result of Smith's murder[12]:

- 1995 FEL 008693[13] relates to the charges Lee Johnson entered a guilty plea for in relation to Smith's murder. *See* Abernethy Decl. Exhs. 2 at 20; 14.

---

[12]  For reasons that are not explained, Dawain Arrington pled guilty to second degree murder of Smith, Abernethy Decl. Exhs. 2 at 18; 17, but his case is not listed in the Nails Declaration.

[13]  The Defendant lists the case number as 1999 FEL 008693.  Undersigned counsel believes this is a typo as the defendant for that case number is Kimley Holsey, not Lee Johnson.

- 1993 FEL 013233 relates to the charges Eugene Mills faced in relation to Smith's murder, and was specifically listed in MAIP's 2024 FOIA request.

- 1994 FEL 000806,[14] also listed in MAIP's request, relates to the charges for which Melvin Beach entered a guilty plea for in relation to Smith's murder. *See* Abernethy Decl. Exh. 15.

- 1994 FEL 007395 and 1994 FEL 007396 relate to conspiracy charges Melvin Beach and Richard Bracey faced for their attempts to intimidate William Crews—one of the government's witnesses in the Adrian Smith murder.  Abernethy Decl. Exhs. 2 at 16; 13, 15.

The Defendant is obligated to read MAIP's reasonably described FOIA requests liberally. *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995).  It must read the requests "as drafted," *Amadis v. United States Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020), *reh'g and reh'g en banc denied,* 2021 U.S. App. LEXIS 1732, 1734 (D.C. Cir., Jan. 21, 2021), not as "agency officials . . . might wish it was drafted," *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 101 (D.D.C. 2013) (citation omitted). Yet, that is exactly what it appears to have done here. The Defendant clearly processed only those records it regarded as related to Mr. Davis, rather than those additional records arising from the homicide of Mr. Smith. Summary judgment should be denied when a review of an agency's search and processing of records "raises substantial doubt, particularly in view of 'well defined requests and positive indications of overlooked materials[.]'" *Valencia-Lucena v. United States Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999).

---

[14] The Defendant lists the case number as 1994 FEL 00806.  Undersigned counsel believes this is a typo.

Even within the Defendant's unlawfully narrow approach, it is not clear that the Defendant in fact processed *all* records that specifically relate to Mr. Davis. Following Mr. Davis' conviction in 1996, he initiated a number of proceedings in the D.C. Superior Court and D.C. Court of Appeals challenging that conviction. *See* Abernethy Decl. Exh. 2 at 2, 8-13 (1996 and 2000 motions for new trials and appeals from denials). Mr. Davis sought post-conviction relief on the ground that the government violated its *Brady* obligations. *See id.* The U.S. Attorney's Office opposed these motions and petitions, yet the Defendant did not produce (or withhold) these records. They surely lie within the 26 boxes of records recovered. But, these records appear not to have been processed.

The Defendant is required to present "reasonably detailed" declarations sufficient to permit this Court to determine how the agency interpreted the requestor's requests, whether it reasonably searched for responsive records, and if the agency lawfully processed the responsive records found. *Am. Oversight v. U.S. Dep't of Health and Hum. Servs.*, 101 F.4th 909, 923 (D.C. Cir. 2024). An agency "may [only be] award[ed] summary judgment solely on the basis of information provided in affidavits or declarations when the affidavits or declarations are 'relatively detailed and non-conclusory[.]'" *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (quoting *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)). The Defendant has not offered that detail, but the hints it leaves us make it reasonably clear that it failed to search for all records relating to Mr. Davis, as required in the 2022 request, and failed to process all (or, actually, any) records arising from the murder of Mr. Smith, as required by the 2024 request.

Aside from the nebulous scope of the unresponsive records, the Defendant asserts that it found and categorically withheld, without a page-by-page review, a set of documents it describes

as "third party" records.  Finney Decl., ¶¶ 14-17. In its letter denying MAIP's second and

broader FOIA request, the Defendant claimed that any records concerning a third party were

"categorically exempt from disclosure" and thus did not require even "a search for the requested

records."  Abernethy Decl., Exh 11. The Defendant does not define or explain the scope of this

term.

Typically, the government asserts this "third party" record defense when a requester

seeks files associated with specifically identified persons in a law enforcement context. *See, e.g.,*

*Blackwell v. FBI*, 646 F.3d 37, 39 (D.C. 2011) (seeking records related to named witnesses).

The government often asserts a *Glomar* response to avoid disclosing whether an identified

individual is or was the subject of a law enforcement investigation. *See, e.g.*, *Roth v. U.S. Dep't*

*of Just.*, 642 F.3d 1161, 1166 (D.C. Cir. 2011). That is not the scenario presented here. MAIP's

2024 FOIA request did not seek files associated with specifically named investigative targets,

witnesses or informants; it requested police and prosecution records arising from a particular

homicide. And it is clear that the Defendant did not search for such records.

MAIP's broader 2024 FOIA request—for records about the Smith homicide rather than

about Mr. Davis—resulted in *no* additional searches or processing of records within the 26

boxes. *See* Nails Decl., ¶¶ 21-23 (second search occurred in April and May, 2024). The

Defendant denied MAIP's request on "third party" grounds *three days* after it was filed, and even

stated that it was "not required to conduct a search for the requested records." *See* Abernethy

Decl., Exh. 11. We are thus left with the firm impression that, for the Defendant, any record that

does not mention Anthony Davis is categorically exempt from production on "third party"

grounds absent a privacy waiver. As demonstrated in Section II, *infra*, such a determination

violates the FOIA. But, for our purposes here, the boundary between unresponsive records and

"third party" records remains murky. The only way to resolve this ambiguity is to require the Defendant to provide a document-by-document inventory of the contents of the 26 boxes.

## II.    The Defendant's Categorical Denial Of "Third Party" Records Violated The FOIA.

The Defendant cannot categorically withhold records related to the murder of Adrian Smith. When MAIP submitted a second broader FOIA request to capture all records related to the homicide of Smith, the Defendant violated the FOIA by refusing to even search for these records, claiming they implicated third party privacy interests and could not be processed without a privacy waiver. *See* Abernethy Decl., Exh. 11. The FOIA does not permit categorical denials merely because the names of individuals other than the requestor may appear in responsive files.

The Supreme Court has explained that categorical denials are appropriate only when the "case fits into a genus in which the balance characteristically tips in one direction." *U.S. Dep't of Justice v. Reporter's Comm. For Freedom of the Press,* 489 U.S. 749, 776 (1989); *see also Nation Magazine*, 71 F.3d at 893 (quoting *United States DOJ v. Landano*, 508 U.S. 165, 176–80 (U.S. 1993)) ("Only when the range of circumstances included in the category 'characteristically supports an inference' that the statutory requirements for exemption are satisfied is such a rule appropriate"). In *Reporter's Comm. For Freedom of the Press*, the plaintiff sought a clearly defined type of document (rap sheets) of identified third parties. Because the Court found that it was "always true" the harm to privacy outweighed the public interest in disclosure of rap sheets, categorical denial was appropriate. 489 U.S. at 779.

However, the D.C. Circuit has been reluctant to permit categorical denials on privacy grounds because the "privacy interest at stake may vary depending on the context in which it is

asserted.'" *Hum. Rights Def. Ctr. v. United States Park Police*, 126 F.4th 708, 715 (D.C. Cir. 2025) (internal quotation omitted). Here, the privacy interests of persons who are alive or dead, convicted or not, criminal defendants or witnesses, persons who testified publicly or did not, are widely varied. They should not all be categorically cloaked in secrecy. The D.C. Circuit has permitted categorical exemptions "only if the documents within each category are sufficiently similar—and the categories are sufficiently well-defined and distinct." *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 675 (D.C. Cir. 2016); *Prison Legal News v. Samuels,* 787 F.3d 1142, 1150 (D.C. Cir. 2015) (rejecting categorical exemption on grounds of privacy when categories of records covered are widely variant); *Raw Story v. United States U.S. Dep't of Def.*, Civ. No. 23-2514, 2024 U.S. Dist. LEXIS 176680 at *28-29 (D.D.C. Sept. 30, 2024) (rejecting undefined categorical withholding of "all responsive records"). Here, the contours of what the Defendant means by "third party" records are so ill-defined that it cannot meet this prerequisite to warrant categorical withholding.

The balance suggested in *Reporters Committee* tips in the other direction in cases, like this one, in which the requester seeks records that do not invariably implicate privacy interests and seeks no records related to particular, identified individuals. An agency may not "exempt from disclosure *all* of the material in an investigatory record solely on the grounds that the record includes some information which identifies a private citizen or provides that person's name and address." *Nation Magazine*, 71 F.3d at 896 (emphasis in original).

*Wright v. U.S. Dep't of Justice*, Civ. No. 14-558, 2015 U.S. Dist. LEXIS 31533 (D.D.C. Mar. 16, 2015), is squarely on point. In *Wright*, the Defendant categorically denied on privacy grounds a FOIA request by counsel for a convicted defendant for records reflecting a grant of

immunity to testifying witnesses at his client's criminal trial. *Id.* at \*1–\*4. Balancing the privacy interests against the public interest, this Court rejected categorical denial, holding that the Defendant failed to demonstrate that the requested records would "necessarily" reveal privacy protected information. *Id*. at \*13. Moreover, the court explained, "[t]he plaintiff is not asking for documents related to any particular person… A search might therefore uncover responsive documents that could be redacted to protect the identities of any named individuals." *Id.*

That reasoning controls here. MAIP neither seeks records related to a particular person nor records invariably containing only private information. Thus, the Court should reject the categorical approach taken by the Defendant and order it to process the set of records it has determined to be "third party" records.

In support of its categorical exemption, the Defendant relies primarily on *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991), a case easily distinguishable from this one. In *SafeCard*, a company requested records created as part of an investigation into alleged manipulation of the company's stock price. The government did not assert, as it does here, that any record mentioning a third party's name is subject to full and categorical withholding to protect the privacy interests of those individuals. Nor did it claim, as it does here, that this categorical exemption justifies its refusal to review each such record.

Instead, the government redacted the names and addresses of people within witness statements, stock records and correspondence to the SEC and disclosed the rest. *Id.* at 1206. The D.C. Circuit upheld the SEC's decision to redact all names and addresses. It did not approve what the Defendant seeks here—permission to categorically withhold documents in their entirety without even looking at them. The D.C. Circuit instead made it clear that *SafeCard*'s approval of

redactions of names and addresses within investigative files did not extend to categorical

withholding of all records containing that private information.

Indeed, the D.C. Circuit later explained that *SafeCard* does not permit an agency "to

exempt from disclosure *all* of the material in an investigatory record solely on the grounds that

the record includes some information which identifies a private citizen or provides that person's

name and address." *Citizens for Resp. & Ethics in Wash. v. United States DOJ*, 746 F.3d 1082,

1094 (D.C. Cir. 2014) (emphasis in original) (citation omitted); *see Raw Story*, 2024 U.S. Dist.

LEXIS 176680 at *29. To the contrary, this Court concluded that, "it is likely that categorical

denials for records concerning publicly disclosed investigations are inappropriate." *Citizens for

Resp. & Ethics in Wash. v. United States DOJ*, Civ. No. 24-1497, 2025 U.S. Dist. LEXIS 53048

at *33 (D.D.C. Mar. 21, 2025).

Moreover, this Court has recently rejected over-reliance on *SafeCard.* In *Raw Story*, this

Court considered and rejected a categorical withholding in a case more difficult than the one

presented here because the plaintiff requested law enforcement records relating to a particular

identified person, rather than an event. Even so, the court said that it "does not understand how

[the Department of Defense] can claim a categorical exemption for records it has not yet

searched for and identified…", *Raw Story*, 2024 U.S. Dist. LEXIS 176680 at *28, adding,

"[d]efendants must acknowledge the existence of responsive records, review them, and offer

evidence that the records fall into a category covered by FOIA Exemptions 6 and 7(C)." *Id*. at

*29. The categorical refusal to review and process responsive records here because they may

identify particular persons is a misuse of the rule in *SafeCard.*

Just as the Defendant misstates the applicability of *SafeCard*, it also misapplies the other

case upon which it principally relies, *Burke v. U.S. Department of Justice*, Civ. No. 96-1739,

1999 U.S. Dist. LEXIS 17542 (D.D.C. Sept. 30, 1999). Unlike this case, the requester in *Burke*

"specifically and exclusively" sought investigative records about particular named persons. *Id. at*

*\*18.* The Defendant asserted, and the Court upheld, a *Glomar* defense. *Id.* at *19. *Burke* held that

the files at issue, if they exist, invariably were associated with specific individuals previously

unacknowledged by the government. *Id*. at *18.

Here, in contrast, MAIP did not request any files of named third parties, thus

distinguishing *Burke*. Nor are the third parties unacknowledged. If they were testifying witnesses

or persons who pled guilty in connection with the Smith shooting, their names are fully public.

**III.    The Defendant Has Failed To Demonstrate That The Privacy Interests Of Publicly Identified, Deceased Or Convicted Persons In A Thirty-Year-Old Murder Case Support Either Categorical Exemption Or Withholding Under Exemption 6 and 7(c).**

The Defendant has relied on Exemptions 6 and 7(c) in support of both its categorical

"third party" withholdings and most of the redactions listed in its *Vaughn* Index. With respect to

both, there is a two-step inquiry. First, the court determines whether the Defendant has carried its

burden of showing by affidavits of "reasonable specificity" that "disclosure would compromise a

substantial, as opposed to a *de minimis*, privacy interest." *Hum. Rights Def. Ctr.*, 126 F.4th at

713 (citations omitted). Second, if the Defendant carries that burden, it must next demonstrate

that the substantial privacy interests outweigh the public interest in disclosure. *Niskanen Ctr. v.*

*FERC*, 20 F.4th 787, 791 (D.C. Cir. 2021). The Defendant has failed to do so under both prongs.

A.    <u>Defendant Has Failed To Account for the De Minimis Privacy Interests of Those Who Are Deceased, Convicted Individuals, or Publicly Known.</u>

1.   *Deceased Individuals Have Considerably Diminished Privacy Interests.*

The D.C. Circuit has made clear that the privacy interests of an individual are

substantially diminished after death. *Davis v. U.S. Dep't of Just.*, 460 F.3d 92, 98 (D.C. Cir.

2006); *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 660 (D.C. Cir. 2003). The death of a witness or other individual identified in the requested records is a "relevant factor to be taken into account in the balancing decision whether to release information." *Schrecker*, 349 F.3d at 661. To make a privacy assessment, the burden falls on the government to "take basic steps to ascertain whether an individual [is] dead or alive." *Id.* at 660.

Here, at least one individual referenced in the withheld records, Eugene Mills, was killed while in custody. *See* Abernethy Decl. Exh 3; *see also* Nails Decl. ¶ 17 (one of the cases listed is for Eugene Mills). Once a subject is known to be deceased, the privacy rationale under FOIA cannot justify continued withholding. *See, e.g.*, *Davis*, 460 F.3d at 98. Neither the Defendant's brief nor its declarations reflect any consideration that certain of the individuals whose privacy interests it asserts are or may be deceased.

Furthermore, Defendant was required to, but failed to, ascertain the life status of named individuals in the responsive records. *Schrecker*, 349 F.3d at 660; *see also Black v. U.S. Dep't of Just.*, 69 F. Supp. 3d 26, 37 (D.D.C. 2014) ("Since death can diminish one's privacy interest, the Court requested that Defendants provide proof of [the individual's] life status"). It is unclear whether other witnesses and individuals who testified at Mr. Davis's trial thirty years ago may also be deceased. Given the passage of time and that many of the people likely referred to these records may have been associated with gangs and imprisoned, it is entirely possible that others have passed away. The Defendant should be directed to determine the life status of each person whose privacy interests it asserts in support of its withholdings and redactions.

2. *Criminally Convicted Individuals Have Similarly Diminished Privacy Interests.*

Privacy interests of persons who were convicted or pled guilty are diminished relative to those who have been acquitted. *See ACLU*, 655 F.3d at 7 (finding that disclosure of convictions

and public pleas is at "the lower end of the privacy spectrum"). And, "the fact that information about these proceedings is readily available to the public reduces further still the incursion on privacy resulting from disclosure." *Id*. at 9.

Here, the Defendant acknowledges that individuals in the Eastgate Crew "were charged, plead and convicted of several murders. Members of the crew provided evidence against each other for plea deals." Finney Decl., ¶ 33. Defendant withheld documents presumably referencing multiple co-defendants, such as Melvin Beach, Lee Johnson, Dawain Arrington, Joseph Wright, and Mark Ray despite their public convictions and known roles in the Smith homicide. Abernethy Decl. Exh. 2 at 3-7, 14-21; and Exhs. 14-18 (guilty pleas). In addition, with the exception of one, each of the individuals listed in ¶ 16 of the Nails Decl., was convicted of crimes that directly related to Smith's murder, *see supra* at pg. 15; *see also* Abernethy Decl. Exhs. 12, 14-18, 20. Accordingly, the privacy interests of these people are substantially eroded. *See Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. United States DOJ*, Civ. No. 18-1860, 2021 U.S. Dist. LEXIS 122947, at *2 (D.D.C. July 1, 2021) (recognizing the "minimal privacy interest threatened by releasing information relating to a public, criminal conviction") (internal quotation omitted).

> ### 3. *Public Trial Transcripts Have Already Identified Testifying Witnesses.*

Witnesses who testify in public trials waive any reasonable expectation of privacy in their identities and testimony.[15] Under the public domain doctrine, "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999). "This exception

---

[15] Abernethy Decl. Exh. 4 and 5 excerpt portions of the trial transcripts that list each of the witnesses who testified at both of Mr. Davis's trials. Given that and the number of exhibits MAIP presents here, MAIP has not included in the record the full trial transcripts.  It can do so upon request.

reflects the commonsense intuition that an open secret is no secret at all." *Jud. Watch, Inc. v. U.S. HHS*, 525 F. Supp. 3d 90, 99 (D.D.C. 2021); *see also Citizens for Resp. & Ethics in Wash. v. U.S. DOJ*, 58 F.4th 1255, 1271 (D.C. Cir. 2023) ("[W]here information requested 'is truly public, then enforcement of an exemption cannot fulfill its purposes.'"); *Raw Story,* 2024 U.S. Dist. LEXIS 176680, at *22 (privacy interests would not be significantly impacted by "disclosure of records confirming what is already in the public domain"). Thus, information that has entered the public domain cannot be exempt from disclosure under FOIA. *Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) ("[T]he government cannot rely on an otherwise valid exemption claim to justify withholding information that has been 'officially acknowledged' or is in the 'public domain.'"); *see also Lenz v. CIA*, Civ. No. 20-3327, 2024 U.S. Dist. LEXIS 176679, *29 (D.D.C. Sept. 30, 2024) (holding that the agency did not properly assert FOIA exemptions where documents were already in the public domain).

"Trial records are generally considered public," and "to satisfy the public domain doctrine, they must be preserved in a permanent public record." *Kowal v. United States Dep't of Just.*, 107 F.4th 1018, 1031 (D.C. Cir. 2024) (internal quotation marks omitted). Preservation in this "permanent public record" can include (1) materials played in open court and admitted into evidence, *Cottone*, 193 F.3d at 555, (2) trial testimony in a public courtroom, *In re Nat'l Broad. Co.*, 653 F.2d 609, 614 (D.C. Cir. 1981), and (3) records available in publicly accessible court filings, *Pike vs. U.S. DOJ*, 306 F. Supp. 3d 400, 410–12 (D.D.C. 2016), *aff'd*, 2017 U.S. App. LEXIS 11316 (D.C. Cir. 2017); *Kleinert v. Bureau of Land Mgmt.*, 132 F. Supp. 3d 79, 95 (D.D.C. 2015) (holding that the contents of two declarations filed in a federal lawsuit were in the public domain). Information preserved in the public domain cannot be withheld under FOIA. *See, e.g.*, *Wolf v. CIA*, 473 F.3d 370, 378–79 (D.C. Cir. 2007).

Witnesses who testified publicly in Mr. Davis's two trials cannot reasonably claim a substantial privacy interest in their names or testimony. Yet, as the Defendant makes clear in its *Vaughn* Index, it redacted from the trial transcripts themselves names of all testifying government employees and private individuals. *See Vaughn* Index at 19-22; *see also, e.g.*, Abernethy Decl. Exhs. 21, 22 (examples). These names are public. Abernethy Decl., Exhs. 4, 5. "[P]ublic access to information already disclosed in public court proceedings" weighs heavily against privacy-based redactions. *ACLU*, 655 F.3d at 7. This showing of improper redactions, at a minimum, creates a genuine dispute of material fact sufficient to deny Defendant's motion. *See, e.g.*, *Reps. Comm. for Freedom of the Press*, 3 F.4th at 361.

The Defendant also withheld in full certain grand jury transcripts on Rule 6(e) grounds. *Vaughn* Index at 20; Finney Decl. ¶¶ 18-21. We do not know who those witnesses are. However, we do know that on June 23, 1995, the grand jury testimony of Raymond Payne, was marked as Defendant's Exhibit 4 and that certain passages of it were read aloud at trial. Abernethy Decl. Exh. 19. If the Defendant withheld in full the Payne transcript, it should be ordered to disclose those passages that have been made public. *Callaway v. United States Dep't of Treasury*, Civ. No. 04-1506, 2007 U.S. Dist. LEXIS 102512, at *30 (D.D.C. Aug. 31, 2007). For the same reason, the passages redacted within Bates 0178-0413 (*Vaughn* Index at 19), the Trial Transcript of June 23, 1995, on Rule 6(e) grounds should be disclosed because they have been made public.

Whatever privacy interests these people once had, they have been lost as a result of the public trials and extensive post-trial briefing which summarized and described the trial testimony. *See* Abernethy Decl. Exh. 1 and 2. Because their names are public, there is also no continuing reason for the Defendant to withhold associated investigative information concealed to protect against the disclosure of their now-public identities. Thus, not only must the names of

persons who were trial witnesses or who were the subject of trial testimony be disclosed but so must be the records withheld in full to prevent the disclosure of the identities of those mentioned in them.[16]

Moreover, the Defendant has the burden of proving that disclosure would implicate a substantial privacy interest. *Hum. Rights Def. Ctr.*, 126 F.4th at 715. The Finney Declaration offers *no* description or explanation of the privacy interests the Defendant asserts on behalf of publicly identified government employees and trial witnesses. The *Vaughn* Index at 19-22 speaks repeatedly and vaguely of "harassment" and that disclosure could produce "unfair stigma which could expose the individual to harassment or criticism." That is not enough.

In *Human Rights Def. Ctr.,* a case in which the plaintiff sought information regarding legal actions taken against United States Park Police, the D.C. Circuit rejected the asserted privacy interests of Park Police officers because the government fell short of demonstrating a "concrete basis" to show a threat of harassment that was "more palpable than mere possibilities." *Id.* at 716. As the court explained, if an affidavit asserts that a substantial invasion of privacy would occur if certain information was disclosed, it must "contain reasonable specificity of detail rather than merely conclusory statements." *Id.* at 713 (quoting *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015)); *see also White Coat Waste Project v. United States Dep't of Veterans Affs.*, 404 F. Supp. 3d 87, 105 (D.D.C. 2019) (government investigator has a privacy interest in their name, but the government failed to show that its release would result in "real, rather than speculative," harm).

Since the privacy interests in each case may vary, the D.C. Circuit emphasized that Exemption 6 "does not categorically exempt individuals' identities" and instead requires a case-

---

[16] According to the *Vaughn* Index, Bates 0001-0025, 0127-0129, 0138-0143, and 0146-0153 are witness statements withheld in full on privacy grounds.

by-case evaluation. *Human Rights Def. Ctr.*, 126 F.4th at 715 (quoting *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 582 (D.C. Cir. 1996)). The court found the affidavit and *Vaughn* index insufficient because they were conclusory and "merely recite[d] the elements of the analysis for whether Exemption 6 applies." *Id.* at 715–16. Because there was no "substantial" prospect that disclosure would violate an officer's privacy interest, the court held that the Park Police had not even met its burden to show Exemption 6 applied, thus obviating the need to balance private and public interests. *Id.* at 716. It ordered the redactions of officer names to be removed from the records and released. *Id.* at 717.

The same is true in this case. Here, the Defendant offers no argument, much less evidence, that any of these individuals have been harassed or threatened since 1995 or since Mr. Davis was released from prison in 2022. Nor has it explained why there is something about the facts of this particular case that threatens future harassment. The Defendant's boilerplate and non-specific speculation, offered over thirty years after the crime at issue, is not sufficient to justify assertion of its privacy-based exemption. Thus, the Defendant has failed to demonstrate that the privacy interests it asserts are "substantial" and this failure obviates the need to balance the public interest in disclosure against those *de minimis* privacy interests. If Court determines that such a balancing is required here, it favors MAIP.

B.  The Public Interest In Disclosure Outweighs The Privacy Interests Asserted By The Defendant.

The application of Exemption 6 and 7(c) requires the agency—and ultimately the court— to "balance the privacy interests that would be compromised by disclosure against the public interest in the release of the requested information." *Bartko v. United States Dep't of Just.*, 62 F. Supp. 3d 134, 145 (D.D.C. 2014) (quoting *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C.

28

Cir. 1993)). Even if any lingering privacy interest remains that are greater than *de minimis*, the public's interest in the information outweighs it.

A FOIA requester "bears the burden of showing (1) that 'the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and (2) that the information [sought] 'is likely to advance that interest.'" *See Roth v. Dept. of Just.*, 642 F.3d 1161, 1175 (D.C. Cir. 2011) (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)). The public interest lies in one understanding the "operations or activities of the government" and "what their government is up to." *U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.,* 510 U.S. 487, 495-97 (1994). In *Roth*, for example, the D.C. Circuit ordered *in camera* review of the requested records based upon the seriousness of the murder conviction to assure itself that there had not been "government misconduct." *Roth*, 642 F.3d at 1178.

Here, the public has a powerful interest in identifying, remedying and preventing wrongful convictions. Wrongful convictions represent a grave systemic issue and reveal an unreliable criminal justice system.[17] The National Registry of Exonerations has recorded over 3,660 exonerations since 1989, representing over 32,750 years lost behind bars.[18] Since To Kill a Mockingbird was published, dozens of non-fiction memoirs and fiction books featuring wrongful conviction have been published.[19] Movies, television shows, and podcasts about wrongful

---

[17] Equal Justice Initiative (EJI), *Wrongful Convictions* (last accessed Apr. 22, 2025), https://eji.org/issues/wrongful-convictions/.

[18] National Registry of Exonerations, https://exonerationregistry.org/ (last accessed Apr. 22, 2025) (The National Registry of Exonerations examines the records of known exonerations of innocent criminal defendants in the U.S. since 1989. It conducts empirical studies of exonerations including frequency, cause, cost, and consequences to educate policy makers and the general public).

[19] John Grisham and Jim McCloskey, *Framed* (2024); Justin Brooks, *You Might Go to Prison Even Though You are Innocent* (2023); M. Chris Fabricant, *Junk Science and the Criminal Justice System* (2022); Brandon Garrett, *Convicting the Innocent* (2011); Jessica S. Henry,

conviction are also countless.[20] In addition, multiple organizations have been formed to address wrongful convictions, including the Innocence Project, the 73 member organizations of the Innocence Network,[21] and many others, including the Equal Justice Initiative and The Exoneration Project.[22]

      An important aspect of this problem is the contribution of government officials and employees in causing wrongful convictions. According to the National Registry of Exonerations, 60% of the exonerations posted are, at least in part, traceable to official misconduct.[23] The Registry defines official misconduct as, "[p]olice, prosecutors, or other government officials significantly abused their authority or the judicial process in a manner that contributed to the exoneree's conviction."[24]  *Cf. Roth*, 642 F.3d at 1177 (the public might well have a significant interest in knowing whether the federal government engaged in blatant *Brady* violations in a capital case").

---

*Twenty Books About Wrongful Conviction that Will Change Your Life*, https://jessicahenryjustice.com/twenty-books-about-wrongful-convictions-that-will-change-your-life/ (last accessed Feb. 26, 2025).

[20] *After Innocence* (2005); *The Central Park Five* (2012); *Making a Murderer* (2015); *10 Best Miscarriage of Justice Podcasts* (Feb. 14, 2025), https://podcast.feedspot.com/miscarriage_justice_podcasts/.

[21] *Innocence Network*, https://innocencenetwork.org/ (last accessed Apr. 22, 2025).

[22] *Wrongful Convictions*, Equal Justice Initiative (last accessed Apr. 22, 2025), https://eji.org/issues/wrongful-convictions/; *What We Do*, The Exoneration Project (last accessed Apr. 22, 2025), https://www.exonerationproject.org/what-we-do/.

[23] Exonerations by Contributing Factor, National Registry of Exonerations, https://exonerationregistry.org/exonerations-contributing-factor (last accessed Apr. 22, 2025).

[24] Understanding the Registry, National Registry of Exonerations, https://exonerationregistry.org/understanding-registry (last accessed Apr. 22, 2025).

The unfortunate frequency of wrongful convictions means the public has an immense interest in knowing if their justice system is operating properly and remedying wrongful convictions. *See Roth,* 642 F.3d at 1176 (finding that "high-profile exonerations of death-row inmates have generated considerable public interest in the potential innocence of individuals sentenced to death"). Thus, the public has a powerful interest in learning not only *if* a wrongful conviction has occurred but *how* that wrongful conviction occurred, the extent of government error or misconduct in causing it, and what governmental reforms are possible to reduce their incidence. *See Citizens for Responsibility & Ethics in Washington*, 746 F.3d at 1092 (substantial public interest in shining light on how the government chooses to investigate and prosecute crimes). Thus, should a public/private balance be warranted in this case, it strongly weighs in MAIP's favor.

## IV.    Defendant Has Failed To Justify Its Assertion Of Exemption 5.

MAIP turns next to the Defendant's asserted exemptions applied to records specifically relating to Mr. Davis, set forth in its *Vaughn* index. Above, MAIP demonstrated the inapplicability of Exemptions 6 and 7(c). Here, MAIP challenges the assertion of Exemption 5.

### A.    Attorney Work Product and Deliberative Process Materials Under Exemption 5

Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). And "this exemption incorporates the privileges available to Government agencies in civil litigation. That list includes the deliberative process privilege, attorney-client privilege, and attorney work-product privilege." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021). Here, the Defendant improperly withheld material under both the deliberative process and attorney work product privileges.

31

### 1. Deliberative Process

The Defendant's *Vaughn* Index purports to withhold in full "Detective handwritten notes," Bates 106-107, 118-121, under the deliberative process privilege. *Vaughn* Index at 10, 13. Neither the Finney Declaration nor the Defendant's brief defend that assertion, and for good reason. There is no legal basis for it.[25]

In passing the FOIA Improvement Act of 2016, Congress added a sunset provision limiting use of the deliberative process privilege to documents created less than 25 years prior to the date on which the documents were requested. *See* 5 U.S.C. § 552(b)(5) ("the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested"). It is obvious these detective notes were made between the 1993 murder and the 1995 trial. Because the agency created the records more than 25 years prior to MAIP's 2022 and 2024 requests, the Defendant cannot rely on the deliberative process privilege to withhold it. *See Hall v. Cent. Intel. Agency*, 268 F. Supp. 3d 148, 164 (D.D.C. 2017) (explaining that had the FOIA Improvement Act been in place at the time the plaintiff filed its FOIA request, the information the CIA had redacted pursuant to the deliberative process privilege "would likely be subject to the sunset provision").

Even if this bright-line rule did not exist, the Defendant cannot withhold the notes because it has not shown the notes are "deliberative." *See, e.g.*, *Cleveland v. United States*, 128 F. Supp. 3d 284, 298 (D.D.C. 2015). The Defendant does not assert the deliberative process exemption on other similar police investigative records, *Vaughn* index at p. 2-18, and does not

---

[25]  The Defendant asserted Exemption 7(E) on these pages as well, but it neither justified that exemption in the *Vaughn* index or in the Defendant's brief. It has therefore waived that assertion. *See, e.g.*, *Maydak v. U.S. Dep't of Just.*, 218 F.3d 760, 765 (D.C. Cir. 2000) (finding the government failed to carry its burden in a FOIA case where the government's declarations and motion for summary judgment made different, unsubstantiated exemption claims).

explain why these, and only these, pages are subject to it. The only apparent difference is that these records are described as "hand written" while the others are not, hardly a compelling rationale for the unexplained difference in treatment.

To be deliberative, a document must "reflect[] the give-and-take of the consultative process." *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006). In assessing whether a document is deliberative, courts will consider "what deliberative process is involved," "the role played by the documents in issue in the course of that process," the "nature of the decision-making authority vested in the officer or person issuing the disputed document," and the "relative positions in the agency's chain of command occupied by the document's author and recipient." *Jud. Watch, Inc. v. DOJ*, 20 F.4th 49, 55 (D.C. Cir. 2021). Importantly, "the privilege applies only to the 'opinion' or 'recommendatory' portion of the report, *not to factual information* which is contained in the document." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980) (emphasis added); *see Reporters Comm. for Freedom of the Press*, 3 F.4th at 365-66.

Here, the Defendant has failed to explain the deliberative nature of the records, or their role in any government deliberations yielding a final agency determination. *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 101 (D.D.C. 2019) ("Without a sufficiently specific affidavit or *Vaughn* Index, a court cannot decide, one way or the other, a deliberative process privilege claim.") (internal quotation omitted). Nor has the Defendant explained why it could not disclose any purely factual descriptions or observations. *See Coastal States Gas Corp.*, 617 F.2d at 867. By their nature, police notes will necessarily be factual in nature. As a result, the Defendant's assertion of the deliberative process privilege should be rejected.

## 2. Attorney Work Product

The Defendant asserts attorney work product over Bates 174-177 (draft findings of fact and conclusions of law and attorney trial notes), and Bates 1660.[26] To the extent the Defendant also asserts attorney work product over detective notes, *see* Finney Decl. ¶ 24, the Defendant nowhere explains the distinction between these notes and other police reports and statements over which it did not assert the exemption.

The primary purpose of a *Vaughn* index lies in its function, not form. *See Lardner v. FBI*, 852 F. Supp. 2d 127, 137 (D.D.C. 2012). Within a *Vaughn* index and declaration, "the agency must offer a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Khatchadourian v. Def. Intel. Agency*, 453 F. Supp. 3d 54, 73 (internal quotation marks omitted). The Defendant did not do so here.

Conclusory statements or vague descriptions are insufficient. *See id.* Similarly, an agency cannot "merely recite the statutory standards." *Carter v. U.S. Dep't of Com.*, 830 F.2d 388, 392-93 (D.C. Cir. 1987). With respect to the work product at issue here, the Defendant has failed to provide sufficient detail to enable the Court to determine whether the documents are work product. The Defendant uses generic language to describe some of its withheld records, including "AUSA trial notes." *Vaughn* Index at 23. This description is too broad to afford MAIP (or the Court) enough information to discern whether they are really work product, or if they merely "happen to have been penned by someone with a law degree." *Am. Immigr. Council*, 950 F. Supp. 242.

---

[26] Bates 1660, however, is the final page of a fully released trial transcript. Abernethy Decl. Exh. 23. Another page 1660, through 1666, Abernethy Decl. Exh. 24, were withheld on Exemption 5 grounds, but are described as "accidentally labeled to pages as 1660 – 1666." *Vaughn* Index at 22. Plaintiff does not know what this means.

In justifying its withholdings under this exemption, the *Vaughn* Index, for the most part, merely states that "[t]he protected information reflects exchange of ideas, guidance, comments, and recommendations among DOJ attorneys leading up to the final outcome in an ongoing criminal prosecution." *Vaughn* Index at 23. This is nothing more than "recit[ing] the statutory standards." *Carter*, 830 F.2d at 392-93. Accordingly, Defendant has failed to provide a sufficient description in the *Vaughn* Index for the Court to determine whether the Defendant has demonstrated the existence of each element required to be shown to justify withholding the records as attorney work product.

## V.    The Defendant Did Not Meet Its Burden Under FOIA's Segregability Requirement.

Citing Exemptions 3, 5, 6, and 7(C), the Defendant withheld *in full* a substantial volume of police investigative material. *Vaughn* Index at 2, 8, 11, 13, 15–17, 19, 21, 23. These records include third-party witness statements, *id.* at 2, 15–17, photo arrays, *id.* at 8, handwritten detective notes, *id.* at 11,13, AUSA draft findings of fact, *id.* at 19, and AUSA trial notes, *id.* at 23. Defendant offers nothing more than boilerplate justifications for its inability to segregate exempt material from non-exempt material, stating that "[t]he responsive material was either exempt itself or was so intertwined with non-exempt information that segregation of the non-exempt information was not reasonably possible[.]" Finney Decl., ¶ 32.

The FOIA, however, requires that "any reasonable segregable portion of a record . . . be provided to any person requesting such [a] record after deletion of the portions which are exempt." 5 U.S.C. § 552(b) (final sentence). Thus, an agency must specifically (1) "consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible" and (2) "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii). As the D.C. Circuit

recently explained, "[e]ven if an exemption covers an entire agency record, the agency still must release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects." *Leopold v. United States DOJ,* 94 F.4th 33, 37 (D.C. Cir. 2024).

Agencies must provide the reasons behind a claimed inability to segregate information, because otherwise "the segregability provision of the FOIA is to be nothing more than a precatory precept." *Mead Data Cent., Inc.*, 566 F.2d at 261. "Non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Lewis v. United States Dep't of the Treasury*, 851 F. App'x 214, 217 (D.C. Cir. 2021) (internal quotation omitted).

An agency must provide a "detailed justification" for why the non-exempt material cannot be segregated *and* "what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data*, 566 F.2d at 261. Courts reject affidavits merely stating that all segregable information was disclosed because they do not include "meaningful explanations." *Heffernan v. Azar*, 317 F. Supp. 3d 94, 133 (D.D.C. 2018). While an affidavit stating that an agency conducted a "line-by-line" analysis can be *necessary*, it is not always *sufficient* to show that an agency conducted an adequate segregability analysis. *Khatchadourian*, 453 F. Supp. 3d at 83.

In fact, an affidavit merely stating that an agency conducted a line-by-line analysis without any specificity about *how* it conducted such analysis can be insufficient, especially when additional evidence shows that the segregability analysis was insufficient. *Id.* at 82–83. Similarly, an affidavit is insufficient when it only includes "a blanket declaration that all facts are so intertwined to prevent disclosure," as the agency must "specify in detail which portions of

[*each* entry] are disclosable and which are allegedly exempt." *Defs. of Wildlife,* 623 F. Supp. 2d at 90 (quoting *Wilderness Soc'y v. Dep't of Interior,* 344 F.Supp.2d 1, 19 (D.D.C. 2004)).

Here, the Defendant falls far short of these requirements. The Defendant merely states that it conducted a line-by-line analysis "to satisfy Defendant's reasonable segregability obligations," Finney Decl. ¶ 32, and then summarily concludes "[t]he responsive material was either exempt itself or was so intertwined with non-exempt information that segregation of the non-exempt information was not reasonably possible without revealing exempt information or leaving nothing but meaningless words or sentence fragments." I*d.*

Several factors cast doubt on this bald conclusion. First, the Defendant withheld a number of records of several pages in length. For example, in the *Vaughn* Index at pages 2, 11, 13, 15–17, the Defendant fully withheld handwritten detective notes as well as transcripts of interviews of third parties on privacy grounds. It defies reason that no passages within these pages are segregable. The Defendant's failure to segregate is hinged on a mistaken belief that witness identities are secret. *See* Finney Decl., ¶ 33 (withheld "witness statements because the information provided could be used to determine who the witness was").

Second, an interview with a non-public witness will contain information about what the person saw, heard, or experienced that can be described without identifying the witness. When, as here, non-segregation does not make logical sense, the Defendant has an added burden to explain the necessity of full withholding. *See Khatchadourian,* 453 F. Supp. 3d at 82–83 (finding that the agency's assertion that it conducted a "line-by-line" analysis insufficient when the Declaration and *Vaughn* index were conclusory and there was additional evidence that the agency did not conduct an adequate segregability analysis).

Imagine a passage written by an officer that reads: "Pat Smith told me that they saw a man with a blue baseball cap, red jacket and white sneakers running from the scene with a gun after they heard gunshots." Pat Smith's name, if not already public, can and should be redacted, but disclosure of the remainder of the sentence does not reveal Smith's identity. What remains are not "meaningless words or sentence fragments," Finney Decl. ¶ 32, but potentially significant information particularly if, for example, the man were actually wearing a green jacket. Again, the nature of the records withheld in full does not align with the Defendant's rationale that they must be withheld entirely.

Third, as discussed, Defendant did not account for the fact that at least some of the witness interviews and police reports likely mention people whose names are in the public domain. MAIP does not challenge redactions of Social Security numbers, home addresses and other sensitive material, but the Defendant cannot square *full* withholding with the fact that names within the records have been disclosed. If names are released, the rationale for full withholding melts away entirely. Given that, the Defendant has not sufficiently explained the nature of the material within the investigative notes, reports, or transcripts to allow the Court to conclude that segregation was not possible. *See, e.g.*, *Mead Data*, 566 F.2d at 261.

Thus, the Court should order the Defendant to re-process these fully withheld police investigatory records, disclose records relating to persons whose names are in the public domain, and segregate non-exempt material from documents concerning persons who both did not testify at trial and were not mentioned at trial.

## VI.    Defendant Has Failed to Satisfy the Foreseeable Harm Requirement.

The Defendant cannot overcome its final obstacle: the foreseeable harm requirement. Even where an exemption applies, an agency may withhold records only if it "reasonably

foresees that disclosure would harm an interest protected by an exemption[.]" 5 U.S.C. § 552(a)(8)(A)(i)(I). To be sure, "Congress adopted the [foreseeable harm requirement] in part out of concern that 'some agencies [were] overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure.'" *Reporters Comm.*, 3 F.4th at 369.

In *Reps. Comm. for Freedom of the Press v. FBI*, the D.C. Circuit interpreted the foreseeable harm requirement and explained that an agency must provide a "focused and concrete" demonstration to identify *specific* harms to the relevant protected interests that would—as opposed to merely could—arise from the disclosure of the withheld materials. 3 F.4th at 369–70; *see also Ctr. for Investigative Reporting v. United States Dep't of the Interior*, 613 F. Supp. 3d 327, 335 (D.D.C. 2020) (explaining that an agency "must show that disclosure *would* cause reasonably foreseeable harms, not that it *could* cause such harms").

Generalized or boilerplate statements are insufficient. *Reps. Comm.,* 3 F.4th at 369-70. As a result, agencies cannot rely on "mere 'speculative or abstract fears,' or fear of embarrassment" to withhold information. *Id.* Nor may the government meet its burden with "perfunctory" assertions. *Leopold*, 94 F.4th at 38. In that way, the foreseeable harm requirement imposes "an independent and meaningful burden" on agencies." *Id. (citing Reps Comm.,* 3 F.4th at 372). If the agency cannot carry its burden to showing the disclosure would cause foreseeable harm to the values protected by the exemption claimed, it cannot establish the absence of material facts in dispute necessary for summary judgment. *Id*. at 38. Here, the Finney Declaration barely mentions the foreseeable harm standard, much less establish it.

A. Exemption 5

The Defendant fails to demonstrate any concrete, foreseeable harm with respect to disclosure of the detective notes and AUSA notes. The Finney Declaration generically states that disclosure "would reveal the government attorney's legal strategies…[and the] prosecution

would be negatively impacted, with accordant negative impacts on public safety." Finney Decl., ¶ 24.

Establishing the foreseeable harm standard requires the Defendant to demonstrate why disclosure of these *particular* documents would cause harm. Its burden is to "directly articulate[] '[a] link between the specified harm and the *specific* information contained in the material withheld.'" *Reps. Comm.*, 3 F.4th at 371 (citation omitted) (emphasis added). The general harms of disclosing work product offered by the Finney Decl. at ¶ 24 are those that may occur before a criminal trial, not thirty years after one. The homicide of Mr. Smith occurred over three decades ago and Mr. Davis's trials took place in 1995 and 1996. Mr. Finney does not suggest that there is an ongoing investigation into this homicide. Nor does he explain how release could possibly cause "negative impacts" on public safety. The Defendant failed to offer anything but "a perfunctory, sweeping, and undifferentiated declaration[.]" *Id.* at 372.

### B. Exemptions 6 and 7(C)

The Finney Declaration's discussion of the privacy exemptions fails to mention foreseeable harm at all. Finney Decl. ¶¶ 25-33. The Defendant has the burden of proving that disclosure would implicate a substantial privacy interest. *Human Rights Def. Ctr.*, 126 F.4th at 715. It must also prove that it "reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I). The D.C. Circuit has clarified that while these are "formally distinct requirements," the applicable analysis "substantially overlap" for Exemption 6. *Human Rights Def. Ctr.*, 126 F.4th at 716.

Here, the Defendant's *Vaughn* Index cannot withstand scrutiny and the language of the *Vaughn In*dex is telling. Fifty-nine times the Index uses the sentence "[d]isclosure could subject him/her to harassment[,]" plus one more which states "[d]isclosure could subject his/her family to harassment." *Vaughn* Index at 2-27. In fact, only three entries across nearly 26 pages *do not*

use that boilerplate language. *See id.* at 19, 23, 25. The Defendant's declarations provide little additional support. The Finney Declaration explains that in considering the case of the "Eastgate Crew," it "evaluat[ed] all material under the foreseeable harm standard. 5 U.S.C. § 552(a)(8)(A)." Finney Decl. at ¶¶ 32-33.

The Defendant fails to explain with any specificity how, after nearly 30 years, any of the mentioned individuals could—much less *would*—be subjected to harassment. *Ctr. for Investigative Reporting*, 613 F. Supp. 3d at 335; *see also Human Rights Def. Ctr.*, 126 F.4th at 715–17. The Finney Declaration does not state that the "Eastgate Crew" still exists today. Nor does he state that Mr. Davis ever threatened any witness who testified against him, either before or after his release from prison in 2022. These omissions are fatal to the Defendant's foreseeable harm argument. Thus, because these names are public and because the Defendant has not demonstrated that they face a real and particularized fear of harassment or retaliation, the Defendant's claimed exemption should be rejected.

## CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment should be denied and the Plaintiff's cross-motion for summary judgment should be granted.

Date: April 25, 2025                                Respectfully Submitted,

                                                     _/s/ Jeffrey S. Gutman_____

                                                     Jeffrey S. Gutman (D.C. Bar No. 416954)
                                                     jgutman@law.gwu.edu
                                                     Bersaveh Belay, Student-Attorney
                                                     Bersaveh.belay@law.gwu.edu
                                                     Trey Donathan, Student-Attorney
                                                     trey.donathan @law.gwu.edu

           Public Justice Advocacy Clinic
           The George Washington University
           Law School
           Jacob Burns Community Legal Clinics
           650 20th Street NW
           Washington, D.C. 20052
           Telephone: 202-994-5797

*Attorneys for Plaintiff Mid-Atlantic Innocence Project*